In re Bernice A. McCUTCHEON, District Justice In and For Magisterial District 10–2–02 Westmoreland County.

No. 3 JD 03.

Court of Judicial Discipline
of Pennsylvania.

March 19, 2004.
Order Affirming Findings of Fact
and Conclusions of Law
April 15, 2004.
Order Dismissing Complaint
April 15, 2004.

Before: SAL COGNETTI, Jr., P.J., ROBERT P. HORGOS, MICHELE O'LEARY, DEBBIE O'DELL SENECA, JAMES E. BEASLEY, JOSEPH A. HALESEY, ROBERT L. CAPOFERRI and PAUL P. PANEPINTO.

CAPOFERRI, Judge.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court against District Justice Bernice A. McCutcheon (Respondent) consisting of five counts which charge Respondent as follows:

1. Violation of Rule 4(D) of the Rules Governing Standards of Conduct of District Justices (Count 1),

2. Violation of Rule 8(A)(1) of the Rules Governing Standards of Conduct of District Justices (Count 2),

3. Violation of Rule 2(A) of the Rules Governing Standards of Conduct of District Justices (Count 3),

4. Violation of Rule 4(B) of the Rules Governing Standards of Conduct of District Justices (Count 4), and

5. Violation of Rule 4(C) of the Rules Governing Standards of Conduct of District Justices (Count 5).

These charges arise out of two telephone conversations Respondent had with her grandson—one during a traffic stop on

May 18, 2002 and one sometime thereafter, and her conduct during a hearing in her court on August 22, 2002.

The Board and the Respondent have submitted stipulations of fact as to some of the issues in the case pursuant to C.J.D.R.P. No. 502(D)(2). The Court accepted these stipulations and proceeded to trial. The Court now makes its Findings of Fact—those numbered 1—29 having been stipulated;[1] those numbered 26 and 30—47 are made by the Court after trial.

## II. *FINDINGS OF FACT*

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania and Judicial Conduct Board Rule of Procedure 31(A)(3), promulgated by the Pennsylvania Supreme Court on March 20, 1995 (amended 1996), the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or justice of the peace, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline.

2. Since on or about 1985, the Respondent has served continuously to the present as District Justice for Magisterial District 10–2–02 in Westmoreland County, the Tenth Judicial District, Pennsylvania, encompassing Allegheny Township, Northmoreland Park, and the Boroughs of Allegheny, Vandergrift, East Vandergrift, Hyde Park, Oklahoma, and West Leechburg, with an office located at 601 Hancock Avenue, Vandergrift, Pennsylvania 15690.

3. On or about May 18, 2002, Sergeant Anthony Depanicis, assisted by Officer Richard J. Gray, both of the Vandergrift Police Department, Vandergrift, Pennsylvania, initiated a traffic stop of a vehicle driven by Philip M. Bartoe. The front seat passenger was Joseph K. Dykes, Jr., the Respondent's grandson and Bartoe's friend.

4. While the Bartoe traffic stop was in progress, Dykes called the Respondent from the Bartoe vehicle on a cell phone and advised that they had been stopped by the Vandergrift Police Department in Vandergrift. Vandergrift is a part of the Respondent's magisterial district. When the Respondent asked why they had been stopped, Dykes replied that he did not know. Dykes did not inform the Respondent of any charge lodged against Bartoe as a result of the traffic stop. No citation was issued to Bartoe that day.

5. While the Bartoe traffic stop was in progress, the Respondent told Dykes not to smart off or act up, to be nice, not to worry about it, and to listen to the police officers and follow directions. The Respondent asked Dykes if Bartoe had been stopped for driving under the influence or anything like that and Dykes replied no.

6. While the Bartoe traffic stop was in progress, Dykes told the Respondent that Bartoe had been trying to get out of a street and could not. Dykes also told the Respondent that the police had Bartoe outside the vehicle for something that he did not do. Dykes identified Sergeant Depanicis and Officer Gray as the police officers on the scene.

7. Sometime subsequent to May 18, 2002, the Respondent had a second conversation with Dykes about the Bartoe traffic stop. Because the Respondent will dispute that this second conversation occurred prior to the summary trial in the matter of *Commonwealth v. Philip M. Bartoe* (TR–0000592–02) held on or about August 22, 2002, the parties agree that

1. Except F.F. No. 26.

they shall address the issue of *when* this conversation occurred at trial on December 17, 2003; however, the substance of the second conversation will be addressed in these stipulations of fact.

8. During the second conversation, Dykes again told the Respondent that prior to being stopped by the police, Bartoe was trying to get out of a street and initially could not. Dykes explained that when Bartoe did successfully pull out from the street, the police activated their patrol car light and stopped him. Dykes told the Respondent that when the police stopped Bartoe, they accused him of being drunk. Dykes told the Respondent, "Phil wasn't drinking, Gram. Phil was not drinking." The Respondent replied, "That's fine."

9. During the second conversation with the Respondent, Dykes further informed the Respondent that Bartoe had to take field sobriety tests and that he and the other passengers were not allowed out of the vehicle at that time. Dykes informed that he and the other passengers stayed in the car the whole time that Bartoe was outside the vehicle, so he saw him taking the field sobriety test.

10. During the second conversation with the Respondent, Dykes told the Respondent that Bartoe told Dykes that the police wanted to search his vehicle, but Bartoe refused and told the police that the Respondent once said he should never let anyone search his car unless they had probable cause or something was in plain view. Dykes also informed the Respondent that Bartoe's mother, Linda J. Bartoe, came upon the scene and the police instructed her to drive them home.

11. During both conversations between Dykes and the Respondent, the charge of Reckless Driving was not discussed. The conversations concerned whether Bartoe had ingested alcohol or marijuana.

12. On or about May 29, 2002, charges were filed in the Respondent's office, namely a summary traffic citation (Traffic Citation No. A5432652–1) charging Bartoe with Reckless Driving, 75 Pa. Cons.Stat. Ann. § 3736. The charging officer was Sergeant Depanicis. Bartoe's citation was one of a number of traffic citations filed by the Vandergrift Police Department on May 29, 2002.

13. On or about August 22, 2003, the Respondent presided over summary traffic cases, including trial in the matter of *Commonwealth v. Philip M. Bartoe* (TR–0000592–02), which concerned the traffic citation for Reckless Driving referenced in Paragraph 12. Trial was scheduled to commence at 6:15 p.m. In addition to the Respondent, present in the courtroom at the *Bartoe* trial were the following persons: Sergeant Anthony Depanicis, Officer Richard J. Gray, and Officer Robert P. Kirkland from the Vandergrift Police Department in Vandergrift, Pennsylvania; and the defendant, Philip M. Bartoe, and his mother, Linda J. Bartoe.

14. The Respondent did not become aware that Bartoe had been cited for Reckless Driving from the May 18, 2002, traffic incident until she was in the courtroom, the parties were seated, and she opened the *Bartoe* case file and examined the citation. The Respondent proceeded to ask Bartoe how he pled, to which he responded "not guilty," and then swore in all trial witnesses. As the trial began and Sergeant Depanicis testified, the Respondent realized that the case related to the May 18, 2002, traffic incident.

15. During the *Bartoe* trial, testimony was presented that Bartoe was trying to pull out of a street at an intersection and that he was having trouble pulling out and was observed pulling up and then retreating more than once before pulling out onto the intersecting street.

16. During the *Bartoe* trial, testimony was presented that after Bartoe pulled out onto the intersecting street, he was followed by the police and pulled over.

17. During the *Bartoe* trial, testimony was presented that the police told Bartoe they believed he was under the influence of either alcohol or marijuana and that Bartoe denied consuming alcohol and no odor of alcoholic beverage was detected on his breath.

18. During the *Bartoe* trial, testimony was presented that Bartoe had taken field sobriety tests.

19. During the *Bartoe* trial, testimony was presented that Bartoe admitted to smoking marijuana. The testimony was conflicting as to precisely when Bartoe last smoked marijuana relative to the traffic stop.

20. During the *Bartoe* trial, testimony was presented that Bartoe refused to permit the police to search his vehicle and told them that the Respondent once said he should never let anyone search his car unless they had probable cause or a search warrant.

21. During the *Bartoe* trial, testimony was presented that Linda J. Bartoe came upon the scene of the traffic stop and about her interaction with the police officers.

22. During the *Bartoe* trial, the Respondent was polite in her demeanor toward Bartoe and Linda J. Bartoe.

23. During the *Bartoe* trial, the Respondent referred to Bartoe alternatingly as "Phil" or "Philip" and "Mr. Bartoe."

24. Prior to August 22, 2002, the Respondent knew Bartoe's grandparents.

25. Prior to August 22, 2002, the Respondent may have given Bartoe a ride in her car.[2]

26. Prior to August 22, 2002, Bartoe had never accompanied Dykes to the Respondent's home to do yard work.[3]

27. Prior to August 22, 2002, Bartoe had accompanied Dykes to the Respondent's home on more than one occasion.

28. During the *Bartoe* trial, the Respondent did not wear her judicial robe.

29. While presiding in court at her magisterial office located at 601 Hancock Avenue, Vandergrift, Pennsylvania, the Respondent wears her judicial robe during civil and criminal matters regardless of the temperature. The Respondent does not wear her judicial robe during summary traffic matters on warm and humid summer days.

30. During the *Bartoe* trial, testimony was presented that after Bartoe refused to permit the officers to search his vehicle Officers Gray and Depanicis told Bartoe that they would get the dogs to come and sniff out the vehicle and either called or pretended to call for the dogs and then told Bartoe that if he would not let them search the vehicle they would impound it and then search it.

**2.** We accept this stipulation and make this finding even though at the trial Bartoe testified that Respondent did not give him a ride in her car and Respondent testified that she agreed to the stipulation, "Because I don't remember. I mean, I could have and I didn't want to lie. I could have. I don't recall, because Joe's friends, I've transported them several places. I never knew Phil Bartoe from Joe Smith." (N.T. 196).

**3.** The parties stipulated that Bartoe *had* accompanied Dykes to Respondent's home to do yard work. See stipulation No. 24. (N.T. 14). However, at the trial both Respondent and Bartoe testified that, in fact, he never had. (N.T. 124, 195).

31. During the trial of this case there was testimony—not presented by the Board, but by the Respondent—that Sergeant Depanicis had testified during the *Bartoe* trial that Bartoe had failed the field sobriety test and that upon hearing that testimony, Bartoe reacted "like he was stunned" (N.T. 206). When Respondent questioned Sergeant Depanicis as to why he had not taken Bartoe in for a breathalyzer examination if he had failed the field sobriety test, Depanicis testified that that decision was at his discretion.

32. During the *Bartoe* trial, Bartoe presented several photographs to the Respondent. While she was studying the photographs Sergeant Depanicis got up, approached the bench and made it known that he wanted to see them. Respondent returned the photos to Bartoe who then handed them to the sergeant.

33. During the *Bartoe* trial, while Respondent was addressing the defendant, Sergeant Depanicis interrupted her demanding "what's your verdict?" (N.T. 105), when Respondent said "Not Guilty" Sergeant Depanicis slammed the citation down on the table, stood up and stormed out of the courtroom his path taking him immediately between Respondent and the defendant to whom Respondent was speaking at the time. Respondent told the sergeant to sit down but "When he was told to sit down, he walked out of the courtroom," (N.T. 112) thus disobeying a direct order of the court.

34. Sergeant Depanicis left the courtroom by way of Respondent's private office, as he did so Respondent told him she intended to report him to his superiors. Sergeant Depanicis reentered the courtroom by another door and, pointing at Respondent, said that he would report her to her superiors.

35. Respondent found Bartoe not guilty of reckless driving because there was no evidence presented to support the charge.

36. The *Bartoe* hearing was scheduled for 6:15 p.m. but before leaving his home for the hearing, Sergeant Depanicis, who was off duty at the time, called the Respondent's office to find out if the Bartoes were there, and upon being advised that they were, called Officer Robert Kirkland, who was then on duty, to drive him to court.

37. Sergeant Depanicis arrived late for the hearing, was unprepared for the hearing inasmuch as, as the citing officer, he had neither a copy of the citation he issued nor the notes he had made in connection therewith. In addition, Sergeant Depanicis dressed for his court appearance in "shorts, sandals and a hat on his head that he never removed during the proceeding" (N.T. 200).

38. During the proceeding, Respondent did not chastise, upbraid, or mention Depanicis's lateness, unpreparedness or dress.

39. Respondent knew Phil Bartoe only as one of a number of friends of one of her grandsons, Joey Dykes. She had never met his mother. She knew his grandparents only casually.

40. Vandergrift Borough is a small town with a population of approximately 5,000. Respondent's entire magisterial district has a total population of approximately 24,000. Respondent has been a lifetime resident of the community. She has served as District Justice for 19 years and before that she worked in the offices of two other district justices—a total of 31 years in the court system of that community. Respondent knows "everybody" in that community (N.T. 195).

41. Respondent knew Officer Gray very well before the *Bartoe* trial. In addi-

tion to knowing him as a frequent witness in cases before her over the course of ten years, Officer Gray had played Santa Claus at a party for Respondent's grandchildren, which included Joey Dykes.

42. Respondent knew Sergeant Depanicis very well before the *Bartoe* trial. We find that that relationship was as Respondent described it:

"Well, the Depanicis family, on the mother's side, their name is Naccarato, and I've known them all my life. They're good friends of our family, because we're Italian and they're Italian. I've known Tony since he was born. I've helped he and his brother through many problems. His brother had problems with getting visitation rights with his children. I helped them with that. Mrs. Depanicis—she was a Naccarato—she and I've always been close friends. And Tony, I've helped him through many crises in his life. It's—I know him ten times better than I know Phil Bartoe." (N.T. 197).

43. The morning after the *Bartoe* trial, August 23, 2002, Respondent went to the Vandergrift police station and reported Sergeant DePanicis's behavior to the Chief of Police. Within ten days thereafter, at the suggestion of the Chief, she had a meeting with the police review committee of Vandergrift Borough on the subject. It wasn't until after that that the officers made their complaints to the Judicial Conduct Board. Officer Gray's complaint is dated September 10, 2002 and Officer Kirkland's complaint is dated September 17, 2002, both of which were received by the Judicial Conduct Board on September 26, 2002.

44. Respondent's reputation in her community for truthfulness is excellent.

45. Respondent did not yell or shout at anytime during the *Bartoe* trial. When Sergeant Depanicis walked between Respondent and Philip Bartoe on his way out of the courtroom, Respondent stood up and in a raised voice told Depanicis to sit back down.

46. It was extremely hot in Respondent's courtroom during the *Bartoe* trial and for that reason Respondent did not wear her judicial robe that evening. It was Respondent's custom not to wear her robe on those days when she heard summary traffic cases when the temperature was in the 90s because, on those days, she is required to be in her unairconditioned, unventilated courtroom all day without interruption. She now wears her robe at all times whatever the temperature.

47. The second conversation between Respondent and her grandson, Joey Dykes, took place sometime after the first conversation, i.e., sometime after the traffic stop of May 18, 2002 and before the *Bartoe* trial of August 22, 2002.

### III. DISCUSSION

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of

proving the charges by clear and convincing evidence.

Pa. Const. Art. 5, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue .... It is not necessary that the evidence be uncontradicted ... provided it "carries conviction to the mind" or "carries a clear conviction of its truth ...."

*In re Adoption of J.J.,* 511 Pa. 590, 515 A.2d 883, 886 (1986). *See, also, LaRocca's Trust Estate,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963); and *In re Cicchetti,* 697 A.2d 297, 306 (Pa.Ct.Jud.Disc.1997), *aff'd,* 560 Pa. 183, 743 A.2d 431 (2000).

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a panel to conduct the trial of this case. The panel, consisting of Conference Judge Capoferri, President Judge Cognetti, Judge Horgos and Judge Beasley conducted the trial on December 17, 2003. Findings of Fact were initially made by the panel.

■ Since the Constitution provides that "all actions of the court ... shall require approval by a majority vote of the members of the court" the panel's Findings of Fact have been reviewed and this decision is rendered by the full Court. Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obliged to accord special deference to the panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted)

*Commonwealth Dept. of Transportation v. O'Connell,* 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). *See, also,* the observations of the United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference'", and in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others." We also determine that this is a case where the presumption should be stronger rather than weaker because, in this case, credibility determinations were critical.

### Part A — Counts 1 and 2

We will first address the charges contained in Counts 1 and 2 which deal with Respondent's alleged violation of Rules

4(D) and 8(A)(1) which grow out of her alleged ex parte communications.

Rule 4(D) provides in pertinent part:

A district justice shall ... neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.

Rule 8(A)(1) provides:

A district justice shall disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (1) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

There are several reasons why the Board has failed to establish that Respondent violated either of these rules.

Let us first consider what facts Respondent learned in the two conversations she had with her grandson, Joey Dykes.

In the first conversation she was told:

1. They were stopped by Vandergrift police in Vandergrift (F.F. No. 4),
2. Joey did not know why (F.F. No. 4),
3. They had not been stopped for driving under the influence or anything like that (F.F. No. 5),
4. Bartoe was trying to get out of a street and could not (F.F. No. 6),
5. Police had Bartoe outside the vehicle (F.F. No. 6),
6. Depanicis and Gray identified as the officers at the scene (F.F. No. 6).

In the second conversation she was told:

1. Same as No. 4 above after which police activated their patrol car light and stopped the vehicle (F.F. No. 8),
2. Police initially accused Bartoe of being drunk (F.F. No. 8),
3. Joey said "Phil wasn't drinking, Gram." (F.F. No. 8),

4. Same as No. 5 above and while outside the vehicle the police had Bartoe take a field sobriety test (F.F. No. 9),
5. Police wanted to search the car (F.F. No. 10),
6. Bartoe told police that Respondent once said he should never let anyone search his car unless they had probable cause or something was in plain view (F.F. No. 10),
7. Bartoe's mother came upon the scene and the police instructed her to drive them home (F.F. No. 10).

■ One reason Rule 4(D) was not violated is because the facts learned in the two conversations did not concern "a pending or impending proceeding." Certainly, at the time of the first conversation there was no proceeding "pending"; and the Board has not established—by any evidence, let alone clear and convincing evidence—that the second conversation took place while a proceeding was "pending," i.e., *after* the citation had been filed, which was not until May 29, 2002.

Consideration of whether a proceeding was "impending" when either of the two conversations took place requires a look at the dictionary.

■ In the *Random House Dictionary of the English Language,* 1973 "pending" is defined as follows:

pending ... *prep.* 1. while awaiting; until: *pending his return.* 2. in the period before the decision or conclusion of; during: *pending the negotiations—adj.* 3. remaining undecided; awaiting decision or settlement; unfinished: *pending business; pending questions; pending litigation.*

In Rule 4(D), both "pending" and "impending" are used as adjectives. Thus, a case is "pending" under Rule 4(D) after it is

filed and is awaiting decision or settlement; after it is begun but is unfinished. As mentioned, it has not been established that any case was "pending" at the time of either of the two conversations.

■ The same dictionary defines "impending" as follows:

impending ... *adj.* 1. about to happen; imminent: *their impending marriage.* 2. imminently threatening or menacing: *an impending strike.* 3. *Rare.* overhanging.

It is clear that the meanings of the two words are very similar—some dictionaries even list "impending" as one of the meanings of "pending", see, e.g., *New College Edition, The American Heritage Dictionary of The English Language,* 1979—however, the drafters of the rule must have thought the words mean something different, otherwise they would not have used both words. What, then, does the word "impending" mean in the context of this case?

Obviously the case was not "impending" at the time of the first conversation, i.e., while the traffic stop was in progress. In order to find that the case was "impending" at the time of the second conversation the Board would first have to establish that the second conversation took place *before* the citation was filed, i.e., May 29, 2002 [4] which it did not, and second we would have to find that the case became "impending" the instant the police let Bartoe go, or at least sometime before May 29, 2002.

In assessing the possibility of making such a finding, we must ask: Are we to conclude that every time police stop a vehicle and issue *no* citation that a case is "impending?" That in that circumstance

the filing of a citation is "about to happen?" or is "imminently threatening or menacing?" We think the opposite is the case. Experience teaches that when police stop a vehicle they issue a citation *on the spot if they are going to issue a citation.* This is particularly true in this case where the initial accusation was that Bartoe was drunk, where a field sobriety test was conducted in order to determine whether that was true or not and that after the test he was let go without any suggestion that he should have a breathalyzer examination or other test and without any charge being made—much less any suggestion or intimation that a charge of *reckless driving* would be made. Are courts supposed to consider a case "impending" because some policeman is *thinking about* making some charge? Are courts required to consider a case "impending" because the police might go back to the station and, annoyed because they were frustrated in their efforts to search a car, or for some other reason, enter upon a discussion of "what can we charge this kid with?"

It is our conclusion that the *Bartoe* case was neither pending nor impending at the time of Respondent's conversations with her grandson and, for that reason, the Board has not established a violation of Rule 4(D).

■ Another reason there was no violation of Rule 4(D) is that there has been no showing that Respondent, in her disposition of the reckless driving charge, either "initiated" or "considered" what she learned in her conversations with her grandson—even if it be postulated that a case was pending or impending at the time.

---

4. Because *after* the citation was filed the case became "pending" and the two words cannot   have the same meaning.

The prohibition of the rule is that "A district justice shall ... neither initiate nor consider ex parte ... communications concerning a pending or impending proceeding." There is no suggestion that Respondent initiated either of the conversations with Joey Dykes; and there is no showing that Respondent considered anything he told her, except insofar as it was repeated by Sergeant Depanicis, Officer Gray or Philip Bartoe in their testimony at the trial.

The evidence in this case establishes that the Respondent's conversations with Joey Dykes related only to the fact of the traffic stop and a possible charge of driving under the influence. There was no discussion of facts relating to reckless driving.[5] There was no reason, therefore, for Respondent to consider what her grandson told her because what he told her bore no relation to the reckless driving case which was before her.[6] The reality is that the Board made no attempt to show that she considered any facts related to her by her grandson. Moreover, even if there were any relationship between those facts *and the reckless driving charge*, the facts related in the two conversations exactly matched the facts established at the trial. As a matter of fact, this was stipulated by the Board. Compare F.F. Nos.

---

5. The parties stipulated to that, see F.F. No. 11.

6. The Board appears to argue that facts relating to Bartoe's possible drinking *do* relate to the charge of reckless driving. This position has no merit either upon legal or factual analysis.

The Board cites *Commonwealth v. Mastromatteo*, 719 A.2d 1081 (Pa.Super.1998). Far from supporting the Board's contention, that case runs counter to it. In that case the Commonwealth obtained a conviction for driving under the influence of alcohol and drugs (defendant had tested positive for both), and also for reckless endangerment. The essential holding of the Superior Court was that the *sine qua non* for conviction of reckless endangerment (which, presumably, the Board equates for this purpose with reckless driving) *is the nature of the driving*; the state of intoxication of the driver is not a consideration. *What is material is actual reckless driving or conduct*, for any reason, for it is this conduct which creates the peril in question. Since people vary in their response to alcohol we believe this is a sound principle. *Commonwealth v. Mastromatteo*, 719 A.2d 1081, 1083 (emphasis added). Explaining in a footnote, the Court said:

In short, there is no hard and fast formula for determining the probable effects of alcohol on any given driver or the increased risk of danger that alcohol consumption creates so as to safely conclude that a driver's alcohol consumption will increase the risk of injury sufficiently to establish legal recklessness.

*Id.* at 1083, n. 4. On that basis the Superior Court reversed the conviction of reckless endangerment.

The Board also refers us to a 2003 case, decided a year *after* the *Bartoe* hearing, *Commonwealth v. Bullick*, 830 A.2d 998 (Pa.Super.2003), but this case also repudiates the Board's position and in doing so cites *Commonwealth v. Mastromatteo, supra*, and quotes from that opinion including some of the same quotations set out above. In the *Bullick* case the Superior Court reversed a conviction for reckless driving holding that evidence of intoxication was no more relevant in establishing that charge than it was in *Mastromatteo* on a charge of reckless endangerment.

From the factual side of things the Board's inspiration for this argument is a mystery because in this case there was no evidence of drinking, there was no evidence of intoxication, or of being under the influence of anything, there was no odor of alcohol; on the other hand, there was evidence that Bartoe was given a field sobriety test as a result of which he was sent home without further testing and no charge of driving under the influence of anything was ever made. Sergeant Depanicis's testimony at Bartoe's trial that he failed the field test is patently incredible for the reason that he never charged him with driving under the influence or, if he felt that failure of the field test was not enough to support that charge, he could have, indeed, should have, taken Bartoe in for a breathalyzer examination—which he did not.

4–11 with F.F. No. 15–21.[7] So, even if Respondent did consider the facts related by her grandson or some of them which the Board has not proven, she was only considering undisputed trial testimony.

For this reason, as well, we conclude that the Board has not established a violation of Rule 4(D).

■ Addressing now the specific directive of Rule 8(A)(1) that:

A district justice shall disqualify himself in a proceeding ... where: (1) he has ... personal knowledge of disputed evidentiary facts concerning the proceeding.

As already pointed out: (1) Respondent had no personal knowledge of any evidentiary facts which related to a reckless driving proceeding, and (2) any evidentiary facts of which Respondent might have had personal knowledge were *undisputed.* Since, under Rule 8(A)(1), it was the Board's obligation to establish the *exact opposite;* it has failed to establish a violation of Rule 8(A)(1).

■ Before finishing our consideration of Count 2, we must examine the charge contained therein that Respondent should have disqualified herself for another reason, i.e., that "[she had] a personal bias or prejudice concerning a party" such that "[her] impartiality might reasonably be questioned." The Board contends that Respondent's impartiality might reasonably have been questioned in this case because she had a personal bias in favor of Philip Bartoe.

The Board bases this contention on the following facts and the following facts alone:

1. Respondent knew Bartoe's grandparents. (F.F. No. 24).

At the trial, Respondent testified:

A. I knew his grandparents.

Q. How do you know them?

A. Well, they're older than I am, but I know everybody in my community. I hate to tell you, I know everybody.

Q. Have they ever been to your house for dinner?

A. Never.

Q. Ever been to their house for dinner?

A. Never. (N.T. 195–196).

2. Respondent may have given Bartoe a ride in her car.

As noted above, the testimony at the trial indicates that this probably did not happen. See n. 2, *supra.*

3. Bartoe had accompanied Dykes to the Respondent's home to do yard work. (F.F. No. 26).

4. Bartoe had accompanied Dykes to the Respondent's home on more than one occasion. (F.F. No. 27).

At the trial Respondent testified about these stipulations and her overall relationship with Philip Bartoe and his family as follows:

Q. The Board has presented evidence that might suggest that you had a close personal relationship with Bartoe and his family. Would you describe for the Court, as best you can, the nature of your relationship to Phil Bartoe before this hearing?

A. I barely knew Phil. Joey mentions Phil on occasion. He mentions other people. I don't know these people. I

---

7. There were *additional* facts elicited at the trial but the facts related in the two conversations, i.e., the attempt to get out of the side street, the stop, the accusation of driving while drunk, the field test, the attempt to search, the refusal, the appearance of the mother, were all reiterated at the trial. (N.T. 192).

have a life and I am busy and I don't deal with his friends. We've had certain problems with Joey, and the friends that he was having his little sprints with, I didn't approve of. Phil wasn't one of them.

Phil is a good boy. Phil has a little bit of a problem with ADD. He's diagnosed as ADD. He's very nervous and he's very—He tends to be noncommunicative. But I don't know, other than that, I don't know Phil. I was surprised and shocked when I got the newspaper—the newspaper article came out that I knew Phil Bartoe and he did yard work for me. He never did yard work for me. Never. I never had that kind of relationship with any of the Bartoe family. Mrs. Bartoe, I never knew. Phil Bartoe had never did yard work for me at my house, to my knowledge.

There may have been times when he's been to my house and dropped my grandson off. I am not in that—I have nothing on my mind to think that he had any communication with me whatsoever. And the grandparents I've known over the past. (N.T. 194–195).

Because of the testimony at the trial, we found as a fact that Bartoe had *not* done yard work for Respondent. See n. 3, *supra*.

In our view Respondent's relationship with Philip Bartoe or his family was not such that established she had *any* bias or prejudice in his favor much less such bias or prejudice as would justify one's reasonably questioning her impartiality—far from it. Respondent's testimony on this point is telling:

Q. When did you first learn that Phil Bartoe was charged with a traffic offense?

A. August 22nd, the night of the hearing is the first—when I opened up the folder and saw Phil Bartoe's name. At that point, it didn't even hit me, because I thought Phil got underage drinking because a lot of Joe's friends get underage drinking, charged with that. I opened the folder. Officer Depanicis was sitting there. I still didn't put that together. I opened the folder, saw May 18th, and then it came to me all of a sudden.

Q. At the time of the hearing, did you know that a request for a change of venue had been made?

A. No, I did not.

Q. Did anyone ask you to recuse yourself or change the venue of the Bartoe case?

A. Never.

Q. Did you consider recusing yourself once you realized what was in front of you?

A. You know what, it crossed my mind, but it was a split decision. And being the person that I am, I can listen to facts and be fair about it. Phil Bartoe, I don't know him as well as I know most people I have hearings with, so why would I be partial to Phil Bartoe? (N.T. 190–191).

In *Reilly By Reilly v. SEPTA*, 507 Pa. 204, 219–21, 489 A.2d 1291, 1298–99 (1985), the Supreme Court of Pennsylvania spoke on the question of recusal as follows:

(a) Canon 3 C,[8] like the whole of the Code of Judicial Conduct, does not have the force of substantive law, but imposes

---

**8.** Canon 3C(1)(a) of the Code of Judicial Conduct is the verbatim counterpart of Rule 8(A)(1) of the Rules Governing Standards of Conduct of District Justices.

standards of conduct upon the judiciary to be referred to by a *judge* in his *self-assessment* of whether he should volunteer to recuse from a matter pending before him.

\* \* \* \* \* \*

Due consideration should be given by him to the fact that the administration of justice should be beyond the appearance of unfairness. But, while the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of judicature, so that courts may as near as possible be above suspicion, there is, on the other side, an important issue at stake: that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause. It is of great importance to the administration of justice that such should not occur. If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion. This must be so for the security of the bench and the successful administration of justice. Otherwise, unfounded and ofttimes malicious charges made during the trial by bold and unscrupulous advocates might be fatal to a cause, or litigation might be unfairly and improperly held up awaiting the decision of such a question or the assignment of another judge to try the case. If lightly countenanced, such practice might be resorted to, thereby tending to discredit the judicial system. The conscience of the judge alone is brought in question; he should, as far as possible, avoid any feeling of unfairness or hostility to the litigants in a case. (emphasis the court's)

We believe, given the realities of the administration of justice in the small towns of our Commonwealth and the incidental and adventitious nature of the contacts Respondent had with Philip Bartoe, that Respondent's split-second decision was right and in full accord with the instructions of our Supreme Court. Actually, the suggestion that Respondent's relationship with Bartoe required her to recuse is perplexing when placed alongside her relationship with the police officers. That relationship was neither incidental nor adventitious: it was longstanding, continuous, and personal. Gray's was such that he either volunteered or was invited to play Santa Claus for Respondent's grandchildren.[9] Respondent testified that she has known the Depanicis family "all my life"; "they're good friends of our family because we're Italian and they're Italian. I've known Tony since he was born." "Mrs. Depanicis—she was a Naccarato—she and I have always been close friends. And Tony, I've helped him through many crises in his life. I know him ten times better than I know Phil Bartoe." "[My relationship with the Depanicis family is] 200 percent greater than with Phil Bartoe. I have no dealings with Phil Bartoe, only as far as knowing he's my grandson's friend." (N.T. 197).

With consideration of all these circumstances it is manifest that the Board has not established by clear and convincing evidence that this judicial officer had a personal bias or prejudice in favor of Bartoe—or his side of the case—and certainly not such which could lead to the reasonable questioning of her impartiality. It may be difficult, in any given case, to show affirmatively that a judicial officer has such a personal bias or prejudice—that,

---

9. He testified he did not consider that Respondent should recuse because of that.

however, does not make the Board's burden to do so any less compulsory.

In our review of Respondent's decision to hear this case, we think it is important to take note of conditions "on the ground" in the courts of our district justices in the Commonwealth.

For the large majority of our citizens their first contact with the judicial system takes place in the courtrooms of our district justices and is with the district justices who serve there. It has been said that the district justice courts are the front lines of our judicial system.[10] That is certainly the reality. As well, is it a reality that the front lines cannot be stretched too thin so the jurisdictions of these courts are of necessity small and it necessarily follows that the judicial officers who preside in these jurisdictions will know and be known to a large percentage of those who will have business in their courts—certainly to a much larger percentage than our Common Pleas Court judges whose jurisdictions cover entire counties or than our appellate judges whose jurisdiction is statewide. Moreover, our political system requires that these district justices live in these small communities, and all do—many all their lives—so it is inevitable, inescapable, that these front line judicial officers will be well known in those communities where they live and work. Our system also requires that they run for election for their office, thus assuring that they will become even more well-known. This is the stage where daily life unfolds in the courtrooms in the communities where district justices serve. This scene was captured by Respondent in an obviously unscripted response at the end of her cross examination:

A. ... But the bottom line is here, I have hearings with people that I know 20 times more than I know Philip Bartoe, and I have no problem having those hearings. I know everybody in my district.

If I had to recuse myself from my neighbors and my—I go to the Giant Eagle and I hear 20 stories every time I go to the Giant Eagle. I hear evidence. People come in my front door and they say, the dogs are barking all night, Judge, I don't know what I'm going to do. I mean, you hear the partial evidence. Do I recuse myself from those cases? (N.T. 242).

A blanket "yes" answer to that question would call down all the mischief of which the Supreme Court warned in *Reilly*. However, generalities do not serve in dealing with questions of personal bias; such determinations must be made case by case. It is enough to say that here, in this case, the Board has failed to show that this Respondent had a personal bias in favor of Philip Bartoe such as would bring her impartiality into question and, thus, it has failed to establish a violation of Rule 8(A)(1).

### Part B — Count 3

■ The Board next charges, in Count 3, that Respondent violated Rule 2(A) of the Rules Governing Standards of Conduct of District Justices. Rule 2(A) provides:

A district justice shall respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A district justice shall not allow his family, social or other relationships to influence his judicial conduct or judgment. He shall not lend the prestige of his office to advance the private interest of others, nor shall he convey or permit others to

10. See, Thomas E. Martin, Jr., Esquire, *Criminal Practice Before District Justices in Penn-sylvania*, 71 Pa. Bar. Assoc. Quarterly 7 (January 2000).

convey the impression that they are in a special position to influence him.

Employing a liberal interpretation of the Board's complaint, the allegations therein which can possibly be matched up with a violation of Rule 2(A) can only be:

— an implication that Respondent's failure to recuse was inimical to the requirement that a district justice "shall conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

— an implication that she allowed her "family, social or other relationships to influence [her] judicial conduct or judgment."

The charges of Count 3 are closely akin to those of Count 2 relating to Respondent's failure to recuse because of her supposed personal bias in favor of Philip Bartoe which supposedly arose out of her social relationship with him.

Inasmuch as we have already thoroughly treated the subject of Respondent's personal bias in this case in dealing with Count 2 and found the Board's proofs insufficient to allow her impartiality to be reasonably questioned under Rule 8(A)(1), we will, without further discussion, find that the Board has failed to prove that the same conduct violated the admonitions of Rule 2(A) that she conduct herself "in a manner that promotes confidence in the integrity and impartiality of the judiciary."

Similarly, we have discussed Respondent's social relationship with Bartoe in connection with Count 2 and found that it was not such that might cause her impartiality to be questioned so, again, we find that the Board has not established that

that same relationship "influence[d] [her] judicial conduct or judgment."

On this latter point we add that we may be reading too much into what the Board is charging with respect to how Respondent may have violated Rule 2(A), for the Board has never suggested that Respondent's verdict of not guilty in the *Bartoe* case was anything other than appropriate,[11] thus, any implication that her relationship with Bartoe influenced her judgment would be incongruous.

### Part C — Counts 4 and 5

■ The Board's charges made in Counts 4 and 5 arise out of the allegations of what took place in Respondent's courtroom during the *Bartoe* trial, in particular as to Respondent's conduct during that proceeding.

Count 4 charges:

The Respondent has violated Rule 4(B) of the Rules Governing Standards of Conduct of District Justices, which provides:

A district justice shall maintain order and decorum in the proceedings before him. He shall wear judicial robes while conducting hearings and trials.

Count 5 charges:

The Respondent has violated Rules 4(C) of the Rules Governing Standards of Conduct of District Justices, which provides:

A district justice shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom he deals in his official capacity, and shall require similar conduct of lawyers, of his staff and others subject to his direction and control.

On these charges the Board rests its case on the testimony of Officers Gray and

11. Actually, the Board has always resisted any relitigating or revisiting of the *Bartoe* case and counsel for the Board stated: "We're not questioning her decision in any respect." (N.T. 251; See, also, N.T. 119).

Kirkland[12] that after hearing all of the testimony, District Justice McCutcheon indicated that the testimony did not support a reckless driving charge and manifested her displeasure and annoyance with the totality of circumstances that had led to the place where they all then were. Those circumstances included:

— the evidence that accumulated and mounted during the *Bartoe* trial that the police were harassing Bartoe and his companions when they stopped him on May 18, 2002, i.e., evidence that they made a vigorous attempt to make an illegal search;

— the incredible testimony of Sergeant Depanicis that Bartoe had failed the field sobriety test and his flippant response when Respondent asked him why, if that were the case, had he not taken Bartoe in for a breathalyzer examination, that that was in his discretion;

— the evidence that, despite Depanicis's testimony that Bartoe had failed the field test, no citation was ever issued for driving under the influence of anything;

— the evidence that the officers had been thwarted, in their persistent efforts to search the vehicle in part at least, by the advice Respondent had given to her grandson or his friend, Bartoe, as to what constituted a legal and an illegal search;

— the evidence that, there being no grounds for a DUI charge, eleven days later, Depanicis filed a citation charging reckless driving;[13]

— the conspicuous absence of any evidence at the *Bartoe* trial that could be said to support a charge of reckless driving;

— the conduct of Sergeant Depanicis at the trial which included:

— his appearing late in company of his chauffeur, Officer Kirkland, who was on duty at the time,[14]

— his appearing unprepared,

— his appearing dressed in shorts, sandals and a hat which remained on his head,

— his demonstrated pique when Respondent did not directly hand him the photographs but rather returned them to Bartoe,

— his interrupting Respondent as she was addressing the defendant, demanding to know her verdict,

— his slamming the citation on counsel table and walking out of the courtroom, interposing, as he did so, between the Respondent and the

---

12.  See n. 13, *infra.*

13.  We here note that Sergeant Depanicis did not testify before this Court. We recognize that his absence was due to *bona fide* medical circumstances which made his presence on the scheduled trial date medically inadvisable. However, we note that the Board neither asked that the trial date be set back nor sought to take the sergeant's deposition for use at trial under our Rule 402, both of which it could have done. We recognize that the Board could have had any number of reasons for deciding not to so proceed, not the least of which might have been a desire to expedite the business of this Court. Nevertheless, since Sergeant Depanicis was clearly Respondent's main antagonist here, and inasmuch as credibility, as mentioned earlier; is central to this case, is it impossible not to consider the Board's decision without those things in mind.

14.  Gray, who was also on duty, was also in the courtroom. Depanicis, Gray and Kirkland are all full-time officers. At the time, Vandergrift Borough had a total of eight full-time policemen, thus, more than one-third of the total complement were in attendance at the *Bartoe* trial and two, of the three officers who, presumably, would be on duty at any given time, were attending the trial. There is little question that, for the Vandergrift police, this was a *big case.*

defendant while she was speaking to him,[15]

— his disobeyance of Respondent's order that he "sit back down."

With the totality of these circumstances in mind, let us consider what precepts it is that Officers Gray and Kirkland,[16] through the offices of the Judicial Conduct Board, have accused Respondent of violating.

She is charged with failing to "maintain order and decorum in the proceedings before [her]," (Count 4, Rule 4(B)). And, she is charged with failing to be "patient, dignified and courteous." (Count 5, Rule 4(C)).

We find that the Board has failed to establish by clear and convincing evidence that Respondent violated either of these rules.

Essentially, these charges consist of the allegation that Respondent was yelling and shouting as the trial was coming to an end. Gray and Kirkland testified to this. Contraposed to their testimony is the testimony of Bartoe, his mother, and the Respondent, all of whom said she did not shout and did not yell. Those three witnesses did testify that when Sergeant Depanicis demanded to know her verdict and stormed out of the courtroom she was visibly offended and angered and in a raised voice ordered him to sit down. In addition, the two witnesses who could have heard any shouting and yelling, Sulava and Turk, who were at their desks just outside the courtroom, testified they heard none and were aware of nothing out of the ordinary until Sergeant Depanicis made his exit from and reentrance into the courtroom. This is a question of credibili-

ty; and we adopt the finding of the panel, which observed these witnesses, that this grandmother does not yell or shout in her courtroom, nor did she on August 22, 2002.

We are constrained to observe that the conduct of Sergeant Depanicis at the *Bartoe* trial was not merely offensive to this Respondent but also to her office and to the judicial system of which her office is a part.

We find that in these circumstances Respondent's conduct was entirely appropriate. It was in fact, an affirmative attempt to hew to the rule to maintain order and decorum in her court which was then being disrupted by a disrespectful policeman.

We make the further observation that Respondent's communication to the assembled members of the Vandergrift police force of her displeasure with their behavior at the Bartoe traffic stop and their subsequent filing of a baseless citation pointedly establishes that she was doing her job, properly regardful of the admonishment of Chief Justice Cappy in the case of *Commonwealth v. Edmunds*, 526 Pa. 374, 409–10, 586 A.2d 887, 905 (1991), where, speaking for our Supreme Court he said:

> It must be remembered that a District Justice is not a member of the executive branch—the police—but a member of the judiciary. By falling within the judicial branch of government, the District Justice is thus charged with the responsibility of being the disinterested arbiter of disputes and is charged further with acting as the bulwark between the police and the rights of citizens.

---

15. As Respondent described it: "when I deal with young adults like Mr. Bartoe, I tend to give them a little bit of mothering, so to speak. And that's what I was about to do." (N.T. 236).

16. Not only did Sergeant Depanicis not testify in this case, he did not file a complaint with the Judicial Conduct Board. His underlings, Gray and Kirkland, did that.

■ We come now to the charge that Respondent was not wearing her judicial robe on the night in question, August 22, 2002 (Stipulation No. 26, F.F. No. 28) and that, while presiding in court at her magisterial district located at 601 Hancock Avenue, Vandergrift, Pennsylvania, it was her custom to wear her judicial robe during civil and criminal matters regardless of the temperature, but not to wear her judicial robe during summary traffic matters on warm and humid summer days. (Stipulation No. 27, F.F. No. 29). In Count 4 the Board charges Respondent's failure to wear her robe in these circumstances was a violation of Rule 4(B), such that subjects her to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.[17]

It is not clear just how Respondent's practice regarding her robe came to the attention of the Judicial Conduct Board. No reference to it is contained in the complaints filed by Officers Gray and Kirkland, so it is likely that it surfaced during the Board's investigation of the other charges. Given the nature of the conduct, given the reason for the conduct and given Respondent's ready admission of it, we see this charge as a "throw-in"—a charge that would not have been made standing by itself. In other words, we are certain that if the Board had not been filing a formal complaint with this Court on the other charges, it would not have filed a formal complaint for her failure to wear her robe. We believe this is of heightened likelihood in this case:

(a) because of the highly unusual conditions in her unairconditioned, unventilated courtroom where, during the summer the temperature was often well over 90 degrees, despite which Respondent wore her robe except during summary traffic court days when she was required to be in her courtroom all day and into the night without interruption,

(b) because of her frank and ingenuous—and unprompted—acknowledgment of her practice to the Board,

(c) because of her immediate response in correcting her practice when advised by the Board that she should, and

(d) because we are aware of the Judicial Conduct Board's judicious use in appropriate cases of its "letter of counsel" under J.C.B.R.P. No. 31(A)(2).

■ We believe that there is little doubt the Board would have disposed of any complaint of Respondent's practice of not wearing her robe on some hot summer days in her unairconditioned courtroom without the filing of a formal complaint in this Court but for the fortuitous coincidence of other charges.[18] And, we do not believe that the fortuitous coincidence of other charges should bootstrap or boost a charge to a level of seriousness it would not have on its own. Put another way, conduct which, by itself, is not such as would justify a finding of probable cause under Article V, § 18(a)(7) of the Constitution so as to support the filing of a formal complaint, does not acquire enhanced gravity by virtue of the fortuitous coincidence that the Board is filing other charges.

We hasten to emphasize that it is not to be taken from our holding in this case that Rule 4(B) is anything less than mandatory or that its mandate is susceptible of subjective interpretation. Nevertheless, we believe it would neither be in the interest of justice nor efficacious in the conservancy of the integrity and good name of our judicial system to hold that this Respondent should be subject to discipline under the Pennsylvania Constitution in this case, considering the extreme conditions in her courtroom and considering that she imme-

17. There is no contention that, on the night of the *Bartoe* trial or at any other time, Respondent was dressed other than in a decorous and seemly fashion—only that she was not wearing a robe.

18. Which we here dismiss.

diately rectified the situation when the matter was called to her attention.[19]

## IV. CONCLUSIONS OF LAW

1. The Board has failed to establish by clear and convincing evidence that the conduct of Respondent violated Rules 4(D), 8(A)(1), 2(A), 4(B) or 4(C) of the Rules Governing Standards of Conduct of District Justices as charged in the Complaint in Counts 1—5 respectively, such as would subject this Respondent to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

### ORDER

PER CURIAM

AND NOW, this 19th day of March, 2004, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon the Respondent,

That, either party may file written objections to the Court's Findings of Fact and Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefore and shall be served on the opposing party,

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and issue an Order setting a date for such oral argument, and

That, in the event that timely objections are not filed, within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order dismissing the Board's Complaint.

### ORDER

April 15, 2004.

PER CURIAM.

AND NOW, this 15th day of April, 2004, the Objections of the Judicial Conduct Board to the Findings of Fact and Conclusions of Law are dismissed, and the said Findings of Fact and Conclusions of Law are hereby affirmed.[1]

### ORDER

PER CURIAM

AND NOW, this 15th day of April, 2004, it is hereby ORDERED that the Complaint against the Respondent is dismissed.

19. Cf. In re Crahalla, 747 A.2d 980 (Pa.Ct.Jud. Disc.2000) where this Court dismissed a charge that Crahalla had violated Rule 11 by serving as Dinner Chairman of a fund raising event for the Boy Scouts. There the Court held that Crahalla's immediate resignation as Dinner Chairman when the possible violation was called to his attention demonstrated that he did not have the requisite mens rea to constitute a violation of the Rule.

1. We will here address the Board's reference, in its Objections, to this Court's remarks in In re Timbers, 674 A.2d 1217, 1219 (Pa.Ct.Jud. Disc.1996) relating to the meaning of "pending" and "impending" as used in Rule 4(D) of the Rules Governing Standards of Conduct of District Justices. The Board complains that our "rulings" in the case sub judice are not in accord with our "prior ruling" in Timbers.

The fact is that this Court made no "ruling" on the subject in Timbers.

In the Timbers case, the district justice had had a prior conversation about a case but he recused from the case so there was nothing before him; thus any reference in that case to the meaning of "pending" or "impending" as used in the Rule was totally unnecessary, gratuitous dictum. In contrast, in the case here before us, analysis of the meaning of these words was necessary to our holding that the Board did not establish by clear and convincing evidence that Respondent violated Rule 4(D).

So that it is clear, even though the remarks on the subject in Timbers are dictum, we, nevertheless, state that, insofar as those remarks in Timbers may be at variance with our holding in this case, they are disaffirmed.